IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

REBECCA JEANETTE EDWARDS,      )
as personal representative of the     )
ESTATE OF WILLIAM DAVID        )
BLACKMON, deceased,            )
                               )   Case No. 1:17-cv-587-ALB
            Plaintiff,         )
                               )
      v.                       )
                               )
DEERE & COMPANY, INC.,         )
                               )
            Defendant.         )

## MEMORANDUM OPINION AND ORDER

This matter comes before the court on Defendant Deere & Company, Inc.'s

Motion to Exclude Testimony of Plaintiff's Expert Witness Eric Van Iderstine, (Doc.

63); Motion to Exclude Testimony of Plaintiff's Expert Witness Kevin Sevart, (Doc.

64); Motion for Summary Judgment, (Doc. 66); and Motion to Strike Untimely

Supplemental Affidavits of Eric Van Iderstine and Kevin Sevart, (Doc. 81). Upon

consideration, the motions are DENIED.

## BACKGROUND

This product liability suit against Deere involves an alleged design defect in

the Deere 4440 tractor. Early one morning, William David Blackmon was working

on a Deere 4440 tractor, which he had obtained through his repossession business.

(Doc. 74-1 at 3). Suddenly, the tractor started and crushed him. Now, Blackmon's

wife, Plaintiff Rebecca Jeanette Edwards, is before the Court as personal representative of his estate. She first filed this case in the Circuit Court for Dale County, Alabama, but Deere removed the case to this Court. (Doc. 1). In her complaint, Edwards makes claims based on the Alabama Extended Manufacturer's Liability Doctrine (AEMLD), negligence, and wantonness.[1] (Doc. 1-1).

Before the accident, Blackmon repossessed the tractor for PeopleSouth Bank and then parked it outside his home. (Doc. 74-3 at 6). Eventually, PeopleSouth Bank asked Blackmon to get the tractor running so it could be sold. When Blackmon attempted to crank the tractor, he determined the batteries needed to be replaced. (Doc. 74-3 at 8). PeopleSouth approved the purchase of two new batteries, so about two days before the accident, Blackmon and Edwards bought them. (Doc. 74-3 at 8).

The night before the accident, Blackmon told Edwards that he was planning to install the batteries the next morning. Early the next morning, a booming sound startled Edwards awake. She ran outside and saw the tractor had crashed into the house. (Doc. 74-3 at 10). As she rushed to Blackmon's side, her neighbor, Ronnie Dobbs, came running from his yard as well. Dobbs had been in his yard and saw Blackmon standing next to the tractor by the tractor steps where the batteries are

---

[1] Count IV was dismissed. (Doc. 23). Counts V and VI merely summarize allegations from Edwards' first three claims. (Doc. 1-1).

located. Dobbs heard a "pop", and then the tractor cranked. "[A]round maybe a second" later the tractor "went to wide open." (Doc. 74-4 at 7). He saw the tractor run over Blackmon, hit three or four cars, and then crash into the house. (Doc. 74-4 at 4). Dobbs ran to Blackmon to help him up, but then climbed onto the tractor and turned it off by opening the fuel bowl, stopping fuel flow to the engine. (Doc. 74-4 at 9). He observed that the tractor's batteries were new, and it appeared Blackmon had just changed them. (Doc. 74-4 at 12–13).

Edwards called her close friend, Amanda Rogers. Rogers remembers overhearing Blackmon on a previous occasion say he was getting new batteries for the tractor to get it ready for the bank. (Doc. 74-7 at 6). She also saw a step ladder near where the tractor had been. Noting that Blackmon was a short man, Rogers believes he would have needed a stepladder to install the batteries. (Doc. 74-7 at 7–8). Rogers arrived at the scene about the same time as emergency services. Emergency personnel rushed Blackmon to the hospital, but he died en route. Later, in various medical reports, medical personnel reported that Blackmon had been run over after reconnecting the batteries: Blackmon had been "working on his tractor when it suddenly started up after he reconnected the battery …." (Doc. 63-6 at 2).

After the accident, the tractor was towed away, and Penn National Insurance Company photographed the damage to the tractor before any repairs were made. (Doc. 74-7 at 10–11). Penn National wrote up the following accident report:

> [Blackmon] was working on a tractor, upon installing batteries, tractor
> started on its own, ran him over, and hit one of the cars on the lot held
> for sale, the insured Equinox, a customer's van and continued on to hit
> mobile home that insured lives in.

(Doc. 74-13 at 2). The tractor was then moved to a John Deere dealership, SunSouth,

LLC, where Kirby Brown repaired it. Ex. 14; (Doc. 74-15 at 3). Among other repairs,

Brown fixed a nonfunctional neutral safety switch. (Doc. 74-15 at 8). Brown noted

that switches on this model of tractor can go bad when the contacts wear out, weaken,

or fill with metal shavings or debris. (Doc. 74-15 at 12).

After the accident, Edwards decided to file this suit against Deere. She enlisted

the expert opinions of two mechanical engineers—Eric Van Iderstine and Kevin

Sevart—who opined that the accident was the result of a bypass start, either

intentional or unintentional, or a stuck starter that activated when the batteries were

reconnected. (Doc. 74-26 at 4; Doc. 74-40 at 4). They proposed that the accident

could have been prevented or avoided if Deere had better designed the tractor or its

accompanying warnings. The case proceeded through discovery, and then Deere

moved for summary judgment on all of Edwards' claims, also moving to exclude

Van Iderstine and Sevart. In response to Deere's Motion for Summary Judgment and

motions to exclude Edwards' experts, Edwards filed supplemental affidavits from

Van Iderstine and Sevart. Deere has moved to strike these supplemental affidavits.

## STANDARDS

### A. Motion to Strike Affidavits

Under Federal Rule of Civil Procedure 37(c), a party's failure to "provide information or identify a witness" as required by Rule 26 precludes use of that information or witness "unless the failure was substantially justified or is harmless." To decide whether the failure was substantially justified or harmless, the Court evaluates "the explanation for the failure to disclose the witness, the importance of the testimony, and the prejudice to the opposing party." *Nance v. Ricoh Elecs., Inc.*, 381 F. App'x 919, 922 (11th Cir. 2010) (quoting *Fabrica Italiana Lavorazione Materie Organiche, S.A.S. v. Kaiser Aluminum & Chem. Corp.*, 684 F.2d 776, 780 (11th Cir. 1982)).

### B. Motion for Summary Judgment and Motions to Exclude Expert Witnesses

The court will grant summary judgment when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc). The moving party need not produce evidence disproving the opponent's claim; instead, the moving party must demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In turn, the nonmoving party must go beyond mere allegations to offer specific facts showing a genuine issue for trial exists. *Id.* at 324. When no genuine issue of material fact exists, the court

determines whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

When a case depends on expert testimony, the Court acts as a "gatekeeper," ensuring that expert witness testimony is reliable and relevant. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). To pass through the evidentiary gate, an expert's opinion is measured with four factors:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. These factors, however, are neither exhaustive nor rigid. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). The Court's focus remains on determining validity and reliability. *Id.*

## DISCUSSION

Deere is moving for summary judgment on all of Edwards' claims. In conjunction with this motion, Deere moves to exclude Van Iderstine and Sevart and to strike their supplemental affidavits. Deere's complaints regarding Edwards' experts are that they offer contradictory theories, with no evidence supporting one theory over another; that their opinions are based on inadmissible evidence; and that

their proposed alternative designs are not feasible. As for the affidavits, Deere claims they are untimely and contain the same allegedly inadmissible information as the experts' original opinions. Deere's Motions to Exclude Expert Witnesses are essentially an extension of the summary judgment motion and will be addressed as part of the motion for summary judgment in Section B.

### A. The Supplemental Affidavits Are Not Improper.

As a preliminary matter, Deer moves to strike Edwards' supplemental expert affidavits. In response to Deere's motions to exclude Van Iderstine and Sevart's expert testimonies, Edwards submitted supplemental affidavits from both Van Iderstine and Sevart. Deere argues that these affidavits are untimely and rely on inadmissible evidence.

Federal Rule of Civil Procedure 37(c)(1) prevents a party from using information or witnesses after failing to provide them "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1252 (11th Cir. 2007) (noting courts have discretion to exclude untimely affidavits). An expert's affidavit is considered timely, "even outside the time frame for expert discovery," if it is properly submitted in conjunction with dispositive motions. *Khan v. KIR Tampa 003, LLC*, 2015 WL 8207813, at *4 (M.D. Fla. Dec. 7, 2015) (quoting *Cedar Petrochems., Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 279 (S.D.N.Y. 2011)). Moreover, experts

may base their opinions on otherwise inadmissible evidence, so long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject …." Fed. R. Evid. 703. In forming their opinions, experts need not rely on personal knowledge. Fed. R. Evid. 602 (noting that need for personal knowledge does not apply to expert testimony under Rule 703).

Considering these principles, Deere's arguments fail. Van Iderstine and Sevart's opinions in the affidavits are consistent with those disclosed in their initial reports and deposition testimonies. Their opinions have not changed: they assert that the tractor started either as a result of a stuck starter or a bypass-start. The only meaningful difference is that Van Iderstine and Sevart now have read Edwards' testimony, which in their view strengthens their respective opinions. Moreover, in arguing against the admissibility of the evidence underlying Van Iderstine and Sevart's opinions, Deere asks the wrong question. The rules of evidence expressly allow experts to rely on otherwise inadmissible evidence. The only relevant question—which Deere has not addressed—is whether experts like these would reasonably rely on such evidence to form their opinions.

Deere also complains that Van Iderstine and Sevart had previously said that they had everything necessary to support their opinions, which is arguably inconsistent with these supplemental affidavits. To the extent their supplemental affidavits are inconsistent with their previous statements, these inconsistencies are

not a basis for exclusion; instead, Deere may use Van Iderstine and Sevart's prior statements to impeach them if it chooses.

Finally, Deere argues that these affidavits are inadmissible under Rule 702. Those arguments are identical to the arguments that Deere made in its motion to exclude expert testimony, which the Court will address below.

## B. Deere's Motion for Summary Judgment is Due to be Denied

Deere moves for summary judgment on all of Edwards' claims, arguing that each of Edwards' claims under the AEMLD and the doctrines of negligence and wantonness fails as a matter of law. Specifically, Deere contends that Blackmon's contributory negligence bars recovery; Edwards' theories amount to res ipsa loquitor, which is not allowed in AEMLD cases; Edwards' experts should be excluded; the experts' proposed clutch oil shutoff valve is infeasible; the warning on the tractor was proper; and, as a matter of law, Deere did not engage in wanton behavior. Each of Deere's arguments will be addressed in turn.

### 1. Deere Can Present its Contributory Negligence Defense at Trial

Deere argues that, no matter what ultimately caused the tractor to move, Blackmon's own negligence caused his injuries. Contributory negligence is available as an affirmative defense in AEMLD and negligence actions. *Caudle v. Patridge*, 566 So. 2d 244, 248 (Ala. 1990) (AEMLD); *see Hannah v. Gregg, Bland & Berry, Inc.,* 840 So. 2d 839, 860 (Ala. 2002) (negligence). "To establish

contributory negligence as a matter of law, a defendant seeking a summary judgment must show that the plaintiff put himself in danger's way and that the plaintiff had a conscious appreciation of the danger at the moment the incident occurred." *Id.* This conscious appreciation cannot be merely a general awareness of danger; it must be an awareness of the specific danger. *Horn v. Fadal Machining Ctrs, LLC*, 972 So. 2d 63, 77 (Ala. 2007). Further, to protect against "inappropriate" uses of summary judgment, evidence of conscious appreciation of a specific danger must be undisputed. *Id.* at 75 (quoting *Hannah*, 840 So. 2d at 861). Under Alabama law, contributory negligence is "normally [a question] for the jury." *Gulledge v. Brown & Root, Inc.*, 598 So. 2d 1325, 1327 (Ala. 1992) (quoting *Chilton v. City of Huntsville*, 584 So. 2d 822, 824–25 (Ala. 1990)).

Here, the evidence does not establish that Blackmon was contributorily negligent as a matter of law. Importantly, the evidence does not clearly establish how the tractor was started. Even if Blackmon knew the tractor was in gear, the evidence remains disputed as to whether Blackmon was consciously aware the tractor might start, especially if there was a delay between the time the engine started and movement began. The lack of certainty on this issue is a hallmark of fact-based questions best left to the jury. Deere may present its contributory negligence theory to a jury as an affirmative defense.

**2. Edwards' Theories of Liability Are Not the Same as Res Ipsa Loquitor.**

Edwards has proposed alternative theories of how the tractor started, and Deere argues that those theories amount to res ipsa loquitor, which is not viable in a products liability action. *See Atkins v. Am. Motors Corp.*, 335 So. 2d 134, 140 (Ala. 1976). In products liability, a plaintiff must affirmatively show a defect in the product. *Townsend v. Gen. Motors Corp.*, 642 So. 2d 411, 415 (Ala. 1994). Res ipsa loquitor falls short of this standard by merely assuming a defect must exist by virtue of an injury. But res ipsa loquitor is not presenting several alternative causes—it is presenting no cause and inferring defect simply because of an event's occurrence and its relation to the defendant. *See Martin v. Comfort Touch Transport, Inc.*, 278 So. 3d 1254, 1262 (Ala. Civ. App. 2018) (citing *San Juan Light & Transit Co. v. Requena*, 224 U.S. 90, 98–99 (1912)). Under Alabama law, a plaintiff may identify multiple defects in a product or propose inconsistent theories of liability. *See, e.g.*, *Vesta Fire Ins. Corp. v. Milam & Co. Const., Inc.*, 901 So. 2d 84, 107 (Ala. 2004) (reversing summary judgment and allowing expert to testify as to multiple theories of liability). Deere's motion for summary judgment on this issue fails.

**3. Edwards' Experts' Testimony is Admissible**

Deere challenges Edwards' experts for allegedly not meeting the standards of Federal Rule of Evidence 702 and offering infeasible alternative designs. (Doc. 63; Doc. 64). "[O]rdinarily, expert testimony is required in AEMLD cases to prove that

the product is defective and that the defective condition caused the product to fail and injure the plaintiff." *Bloodsworth v. Smith & Nephew, Inc.*, 476 F. Supp. 2d 1348, 1353 (M.D. Ala. 2006) (internal quotations omitted). Accordingly, if Edwards had no expert testimony to support her claims, summary judgment would be appropriate.

Here, Edwards has enlisted the opinions of two mechanical engineers, Van Iderstine and Sevart. Van Iderstine has offered testimony on the design and adequacy of mechanical systems in other cases. (Doc. 75-1 ¶¶5–6, 13). And Sevart specializes in investigating accidents and evaluating mechanical designs, including agricultural equipment. (Doc. 76-1 at 3, 11). Deere's arguments as to these experts fail.

### i. Van Iderstine and Sevart are Qualified to Offer Their Opinions

Deere concedes that Sevart is qualified but contends that Van Iderstine is unqualified because his experience is not focused on tractors. But an expert is not required to have worked on the product at issue to give an expert opinion on it. *See, e.g.*, *Bullock v. Volkswagen Grp. of Am., Inc.*, 107 F. Supp. 3d 1305, 1313 (M.D. Ga. 2015) (allowing expert to testify despite not having designed or previously examined precise type of product at issue). Van Iderstine has extensive training detecting defects in mechanical systems including fluid mechanics, strengths of materials, machine design, and engineering mechanics. (Doc. 74-56 at 3). And his extensive

work history includes designing, manufacturing, and producing mechanical systems. (Doc. 74-56 at 3). He is qualified to offer the opinions he has expressed in this case.

Moving to the substance of the experts' opinions, Van Iderstine and Sevart offered three possibilities for how the tractor could have started: an intentional bypass start, an unintentional bypass start, or a stuck starter that activated when the batteries were reconnected. (Doc. 74-26 at 4; Doc. 74-40 at 4). Of the three, Van Iderstine found the battery theory most compelling based on Dobbs' testimony and the fact that new batteries had been installed in the tractor (Doc. 74-26 at 4–5). Sevart testified that, although the physical evidence did not conclusively favor one of the three possibilities, the witnesses' testimony—specifically testimony about Blackmon's reasons for working on the tractor—led him to believe the unintentional bypass theory was most likely. (Doc. 74-40 at 4–5). In Sevart's opinion, the heart of the problem is that the tractor could start and immediately move without anyone at the controls. (Doc. 74-40 at 5).

Deere contends that there is a lack of evidence to support Van Iderstine's opinions because he has neither examined the starter nor tried to replicate his theory on any tractor. Because of this alleged lack of evidence, Deere contends that Van Iderstine's opinions are mere speculation. However, Van Iderstine did examine and test the tractor. (Doc. 74-56 at 5). He also obtained and tested an exemplar starter. (Doc. 74-56 at 5). The original starter was no longer useful after the accident, since

any indications of what might have happened had been worn away. Van Iderstine was also persuaded by new batteries having been installed and the ER report stating that the tractor had started after Blackmon reconnected the battery. Despite Deere's hearsay objections, experts are expressly allowed to consult otherwise inadmissible evidence if an expert would consult the type of information to form an opinion.[2] Fed. R. Evid. 703.

As for Sevart, Deere complains that his opinion is based on speculation, such as assuming that Blackmon was using the battery charger at the time of the accident. Where direct evidence fails, an expert may also make inferences from circumstantial evidence. Here, Sevart has cited abundant circumstantial evidence. First, the battery charger was at the scene of the accident. (*See* Doc. 64 at 9; Doc. 74-3 at 14–15). Second, Edwards testified that she had never seen Blackmon use a screwdriver to bypass start an engine, and she had never seen him bypass start a tractor. (Doc. 74-3 at 16, 19). In fact, Blackmon owned a starter switch he would use when bypass starting automobile engines, which was not found at the scene of the accident. (Doc. 74-3 at 16).

Further, Deere complains that Sevart's opinion about the delay is not relevant since Sevart said a delay itself was not a defect. But Sevart's statement is

---

[2] Regardless, this testimony could be admissible under a host of hearsay exceptions including present sense impression, excited utterance, or dying declaration. Fed. R. Evid. 803(1)–(2), 804(b)(2).

unremarkable. He merely notes a delay would aggravate an existing defect but be irrelevant absent an existing defect. And there is ample evidence of a delay, much of it offered by Deere. (Doc. 74-23 at 8; 74-28 at 2; Doc. 74-30 at 2; 74-34 at 2). The sole eyewitness to the incident, Dobbs, testified that he heard the tractor "pop" and then go to wide open after "maybe a second." (Doc. 74-4 at 7). He also said that "as soon as [the tractor] cranked, it was moving." (Doc. 74-4 at 7) And when asked if it was "instantaneous," Dobbs replied, "I hate to say it that way but it was sort of—it amazed me. I wish I had a drag car speed up that quick…" (Doc. 74-4 at 7). Both parties cite this statement as evidence for whether a delay existed. The fact-finder at trial can make the proper determination.

Van Iderstine and Sevart's opinions are admissible. The fact-finder at trial will decide the weight that their opinions should be given.

### ii. A Reasonable Jury Could Conclude That the Alternative Designs Were Feasible and Would Have Prevented Blackmon's Death

Deere also moves to exclude Van Iderstine and Sevart's opinions on whether alternative designs would have prevented Blackmon's death. Deere asserts that their designs were not feasible at the time the tractor was manufactured and that they have not adequately tested their designs. In a case like this one, a plaintiff must show that a safer, practical, alternative design was available when the product was manufactured. *Townsend*, 642 So. 2d at 418. Under Alabama law, it is generally up to the fact-finder to decide whether an alternative design is reasonable. *Hosford v.*

*BRK Brands, Inc.*, 223 So. 3d 199, 205 (Ala. 2016). In limited circumstances, the court may hold that an alternative design is unreasonable as a matter of law. *Id.* For example, a court should not apply the law to "'impose liability in such a way as to eliminate whole categories of useful products from the market.'" *Id.* at 207 (quoting *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 385 (Tex. 1995)) (noting court should not impose liability on defendant for selling product with inexpensive design versus more expensive design because that rule could eliminate useful items serving those who cannot afford more expensive models).

Both Van Iderstine and Sevart offered a variety of proposed alternative designs.

First, Van Iderstine and Sevart both proposed a clutch oil shut off valve that would prevent movement. As an example, they point to a sequencing valve that was developed by General Motors a decade before production of this tractor. (Doc. 74-26 at 14). Deere contends that it invented the experts' proposed design, calling it the EOV, but not until after the tractor was built. Deere notes that a party cannot be held liable in a products liability action for failing to invent a safer product. But that statement does not reflect the experts' opinions. Instead, Van Iderstine opines that EOV is merely a clutch oil shut off valve—a product that had been developed and in use for many years. Two such valves were patented in 1962 and 1963 by Caterpillar Tractor Co. ("Hydraulic Controls" patent #3,181,394 filed March 19,

1962; "Transmission Control System Employing a Differential Check Valve" patent #3,217,726, filed February 25, 1963). In fact, Van Iderstine points out that Deere's own 1981 EOV patent cites similar valves that have been used to prevent unintended movement. (Doc. 74-38 at 9). Deere states that while the various components of the EOV were available, the EOV itself was not. This dispute is for the fact-finder at trial.

Second, Sevart proposed using an Operator Presence System. Deere alleges that Sevart's "Operator Presence System" would require eliminating mechanically controlled fuel systems in favor of electronically controlled fuel systems, which would fundamentally change the product. But Edwards argues that Sevart's alternative design would involve the simple step of replacing a manually operated knob with an electrically operated switch. In fact, Sevart claims his design is similar to a 1940 patent assigned to Deere for a "Safety Control Device." Again, this dispute is for the fact-finder to revolve at trial.

Third, Sevart proposed using a Safety Start System or Hard-Wired System. Deere complains that Sevart has only conceptualized his Safety Start System and Hard-Wired System and that he has neither made design plans, drawings, mock-ups, or prototypes nor actually tested his idea. But testing is not a prerequisite for admitting expert testimony. An expert cannot make a "bald assertion," without relying on experience or evidence. *Gen. Motors Corp. v. Jernigan*, 883 So. 2d 646,

663 (Ala. 2003). And Sevart has not done so. Instead, Sevart proposed design alternatives based on his experience and after reviewing the tractor and data from his own research and from Deere. After reviewing this information, Sevart determined that the starter could be prevented from engaging the engine flywheel unless the transmission was in neutral. (Doc. 74-57 at 8). This design alternative proposes a solution consistent with the alleged design defect: being able to move while in neutral. He also came up with a hard-wired system that would have eliminated the exposed terminal connections at the starter solenoid by use of "hard-wired" or sealed wired leads. Deere argues against these designs, but this dispute is for the fact-finder at trial.

Fourth, Van Iderstine proposes that Deere should have either created a more robust solenoid cover or repositioned the solenoids. (Doc. 74-26 at 15). Deere responds that Van Iderstine's ideas are just theoretical and that he has done no work to develop these products or to see if they are feasible. Actually, Van Iderstine testified that he obtained exemplar covers and found them flimsy and thin. (Doc. 74-26 at 15). Deere also contends that Van Iderstine cannot establish that his design would have deterred a determined bypass start. The jury, not the Court, is in the best position to evaluate whether a move robust cover or repositioned solenoid would have prevented Blackmon's accident.

As for the warning, Van Iderstine focuses on the material used for the warning while Sevart focuses on the substance of the warning itself. Van Iderstine opines that Deere should have created a more durable warning that would last life of the product, such as the metal placards used for logos on the tractor. And Sevart alleges that the warning was defective because it did not "state that the tractor would start in gear at the solenoid …." (Doc. 74-40 at 8). According to Sevart, a proper warning should have warned that (1) the starter gear may stick in a way that closes the starting circuit so that changing or charging batteries may start the tractor and run over the user, or (2) the tractor may be accidentally bypass started if metal ends of jumper cables inadvertently contact both exposed solenoid terminals.

Regarding Sevart's proposed warning, Deere complains that Sevart is not a warnings expert and has not made any mockups or prototypes of the warnings he has proposed. But Sevart possesses extensive experience. He has been educated and trained as a design engineer, he is familiar with safety standards, and he is a member of the organization that sets standards for safety signs for agricultural equipment. (Doc. 74-57 ¶¶29–31). He is qualified to offer his opinion on proper warnings.

Deere also contends that there is no evidence that Blackmon would have read an alternative warning. Deere claims the evidence shows Blackmon already knew that bypass starting was dangerous. (Doc. 74-3 at 16–17; Doc. 74-4 at 8). The Court, however, cannot determine as a matter of law that Blackmon would not have heeded

a warning. Taken in the light most favorable to the nonmovant, the facts show that the existing warning was illegible. Again, the Court's focused analysis must remain on the expert's "principles and methodology, not on the conclusions that [he] generate[s]." *Daubert*, 509 U.S. at 595. Deere's arguments go to the underlying facts, so whether Blackmon would have heeded a different warning is a question for the fact-finder at trial.

## 4. The Feasibility of the Clutch Oil Shut Off Valve is Best Left to the Jury, as Explained Above

Deere challenges Edwards' experts' clutch oil shutoff valve alternative design. As already discussed above, this is a question best left to the fact-finder at trial.

## 5. Whether Deere's Warning was Adequate Presents a Genuine Issue of Material Fact

Deere notes that it had initiated a safety campaign to place warning decals about bypass starting on its tractors. Edwards responds that while there was a warning, it did not sufficiently warn of the myriad dangers posed: the tractor could start in gear and move if bypass started at the solenoid, delayed movement could exacerbate this risk, a stuck starter could cause the tractor to start when reconnecting the batteries, and jumpstarting the tractor could result in injury. Edwards also argues that a warning is only as effective as it is legible and noticeable. An unreadable

warning cannot adequately warn, Edwards claims, so a more durable material should have been used.

"[U]nder Alabama law, '[a] negligent-failure-to-adequately-warn case cannot be submitted to a jury unless there is some evidence that the allegedly inadequate warning would have been read and heeded and would have kept the accident from occurring.'" *Lakeman v. Otis Elevator Co.*, 930 F.2d 1547, 1553 (11th Cir. 1991) (quoting *Gurley v. Am. Honda Motor Co.,* 505 So.2d 358, 361 (Ala. 1987)). For example, testimony that the decedent was "careful and safety conscious" and even "sometimes 'too careful'" would "easily" be enough evidence for a fact-finder to determine a warning would have been read and heeded. *Id.*

Here, Rogers testified that Blackmon was "safe," "curious and careful," and would not "put himself or anybody else at risk …." (Doc. 74-7 at 5). Dobbs testified Blackmon was "a safe mechanic." (Doc. 74-4 at 8, 10). And Edwards testified that Blackmon had never bypass started a tractor, would always use his switch to bypass start other vehicles, and always made sure a motor was in park or neutral before working on it. (Doc. 74-3 at 5, 17). This evidence is sufficient to create a genuine issue of material fact as to whether Blackmon would have heeded a different warning.

**6. Edwards has Presented a Material Issue of Fact Regarding Wantonness**

Deere argues that it could not have anticipated the danger posed by its tractors and that, after it learned of the danger, it embarked on a campaign to educate and prevent bypass starting. Edwards responds that, despite these remedial measures, Deere was wanton by failing to immediately act on deaths caused by the tractors. Edwards alleges that Deere knew about the defect but failed to act for years, whereas other defects were immediately remedied after a single incident.

Wantonness is the conscious act or omission of a duty while knowing of the existing conditions and that the act or omission will likely or probably cause injury. *McDougle v. Shaddrix*, 534 So. 2d 228, 231 (Ala. 1988). "Wantonness is a question of fact for the jury," unless there is insufficient evidence to raise a question of material fact. *See Cash v. Caldwell*, 603 So. 2d 1001, 1003 (Ala. 1992) (quoting *McDougle,* 534 So. 2d at 231).

Here, Edwards has presented a material issue of fact as to what Deere knew and when it knew it. Although Deere correctly notes that it cannot have been negligent and wanton at the same time, Edwards is not restricted to arguing one or the other. Litigants frequently make arguments in the alternative. And whether the tractor started through a bypass or a faulty starter, Edwards can argue that Deere acted wantonly in failing to remedy the situation sooner. This claim is best determined by the fact-finder at trial.

## CONCLUSION

Based on the above reasoning, the Court orders as follows:

1. Deere's Motion to Exclude Testimony of Plaintiff's Expert Witness Eric Van Iderstine, (Doc. 63), is DENIED;

2. Deere's Motion to Exclude Testimony of Plaintiff's Expert Witness Kevin Sevart, (Doc. 64), is DENIED;

3. Deere's Motion for Summary Judgment, (Doc. 66), is DENIED; and

4. Deere's Motion to Strike Untimely Supplemental Affidavits of Eric Van Iderstine and Kevin Sevart, (Doc. 81), is DENIED.

**DONE** and **ORDERED** this 26th day of November 2019.


_____/s/ Andrew L. Brasher_____
ANDREW L. BRASHER
UNITED STATES DISTRICT JUDGE